IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 116-050 |
| | ) | |
| KENNETH REED, JR. | ) | |

_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Charged with one count of possession of a firearm by a convicted felon, Defendant

Kenneth Reed, Jr., moves to suppress the Bryco .380 caliber pistol discovered during his

encounter with law enforcement officers on April 5, 2016.  Although Defendant submitted

three motions to suppress in an effort to comply with the particularization requirements of

Local Criminal Rule 12.1, they raise the same argument for suppression.  (See doc. nos. 25,

30, 35.)  For ease of reference, the Court will cite to the second amended motion, but the

recommendation applies to all three motions.  Upon consideration of the pre- and post-

hearing briefs, as well as the testimony and evidence presented at the hearing on May 23,

2017, the Court **REPORTS** and **RECOMMENDS** the motion be **DENIED**.

I.     **FACTS**

   A.     **Defendant's Affidavit and Hearing Testimony**

   According to Defendant's pre-hearing affidavit, on the date of the events forming the

basis for his indictment, he was leaving his child's mother's home early in the morning on

foot when a police vehicle stopped beside him and the officer told him, "Come here."

(Def.'s Aff., doc. no. 35-1, ¶¶ 3-4).  When Defendant inquired why, the officer did not

provide any explanation and instead replied, "Bring your ass here." (Id. ¶ 5.)  Defendant complied by walking toward the vehicle because he did not feel free to leave and did not want to be arrested or harmed for not complying. (Id. ¶ 6.)  "At no point in time did [Defendant] place [his] hand inside [his] pocket because [he] is aware that this type of gesture may be seen as threatening to law enforcement officers." (Id. ¶ 7.)

The officer walked toward Defendant as Defendant stopped walking, and the officer immediately placed his hands inside Defendant's pockets upon making contact. (Id. ¶¶ 8-9.) The officer did not ask for consent to search. (Id. ¶ 12.)  Defendant does not describe when the pistol was discovered, but he states after he was searched, he was told the police were looking for someone dressed entirely in black. (Id. ¶ 10.)  Defendant was not dressed entirely in black, and a lieutenant who later arrived at the scene confirmed Defendant was not wearing a reversible top. (Id. ¶ 11.)

Defendant was placed in the back of the police car for several minutes until the complainant who made a 911 call about a suspicious person arrived at the scene. (Id. ¶ 13.) The complainant "told the officers that [Defendant] was not the individual who was dressed in all black that he saw earlier." (Id. ¶ 14.)  Defendant was then taken to jail based on charges of carrying a concealed weapon. (Id. ¶ 15.)

When providing testimony under oath at the evidentiary hearing, Defendant was able to provide additional detail about his encounter with law enforcement officers, but his recollection of events changed somewhat from the description in his affidavit. Defendant testified he was walking home from his fiancé's house at approximately 7:00 a.m., wearing a gray jacket, a white t-shirt, a black do-rag on his head (described as a headband), black pants,

2

and black shoes.  Court's recording system, *For the Record*, (hereinafter FTR), 10:12.58-13.25; 10:19.12-.54-:20.30  Defendant turned left out of his fiancé's house on Lyman Street, walked down Dean's Bridge Road, and turned left onto Wheeless Road, where he encountered an officer approximately fifteen or twenty minutes after leaving his fiancé's house.  FTR 10:20.52-:21.35.  Defendant stayed on the sidewalk throughout his walk, never cut through backyards, or stopped to look in the windows of cars or homes along the way.  FTR 10:21.38-:22.12.

Two police cars passed Defendant before a third car stopped, and the officer told Defendant, "Bring your ass here."  FTR 10:14.00-.34.  This first interaction occurred between Virginia Avenue and Dickey Road, on Wheeless Road.  FTR 10:22.30-:23.02.  The officer pulled up next to Defendant in his marked car, facing the same direction Defendant was walking but without activating any of the emergency lights.  FTR 10:23.05-.25; 10:23.36-:24.01.  The officer got out of the car before first speaking to Defendant.  FTR 10:24.43-.46.

Initially, Defendant did not stop walking away from the officer because he knew he had not done anything wrong and felt free to keep walking away.  FTR 10:14.44-.49; 10:25.44-.55.  The officer again said, "Bring your ass here."  FTR 10:15.02-.05. At that point, Defendant stopped walking because he no longer felt free to leave based on the officer's aggressive tone of voice.  FTR 10:15.10-.22.

Contrary to his affidavit, Defendant testified he had his hands in his pocket while he was walking down the sidewalk, but removed them when he encountered the officer because it was a "normal gesture" not to have his hands in his pocket.  FTR 10:16.14-.44.  On cross

3

examination, Defendant offered two versions of the timeline for when he had his hands in his pocket.   He finally settled on having his hands in his pocket while walking down the sidewalk but removing them by the time the officer "came up on him."   FTR 10:26.20-:27.00.   When asked about the discrepancy between the statement in his affidavit that he never had his hands in his pocket because he knew the gesture was threatening to officers and his testimony that it was simply his "normal gesture" not to have his hands in his pocket, Defendant conceded that he knew having his hands in his pocket could be seen as a threatening gesture.  FTR 10:27.00-:28.56.

When Defendant stopped walking, the officer approached Defendant and again said, "Bring your ass here."  FTR 10:15.25-.45; 10:24.58-:25.00.  Although the officer raised his voice to Defendant, no curse words were used, no threats were made, no weapon was drawn, and no handcuffs were applied.  FTR 10:29.10-.35.  The officer "walked up on" Defendant and immediately frisked him, without ever asking for or receiving permission to search Defendant.   FTR 10:15.49-:16.06; 10:25.00-.06.   Defendant estimated approximately two minutes, a "short time frame," elapsed between when the officer got out of his car and when he frisked Defendant.  FTR 10:30.54-:31.12.

Contrary to his affidavit statement that the officer "immediately placed his hands inside my pockets upon contact with me," (Def.'s Aff. ¶ 9), at the hearing, Defendant described the frisk as the officer patting all over the outside of his clothing.  FTR 10:30.26-.52. During the frisk, the officer discovered Defendant's handgun, which he had bought off the street. FTR 10:31.20-.31. Defendant offered conflicting testimony about whether he was

handcuffed before or after he was frisked and the gun found.  Cf. FTR 10:29.39-.42 (after frisk) with 10:31.46-.58 (prior to finding gun during frisk).

After the officer found the gun, Defendant was arrested and placed in the back of the police car for approximately forty-five minutes to one hour.    FTR 10:16.52-:17.05. Defendant was eventually told he was stopped because officers were looking for someone dressed entirely in black.  FTR 10:17.10-.20.  When the complainant who made the 911 call regarding a suspicious person was brought to the scene, officers removed Defendant from the back of the car, but the complainant told the officers Defendant was not the person he saw. FTR 10:17.37-:18.11.   Although Defendant was arrested based on the discovery of the firearm, he was never arrested for anything related to the 911, suspicious person call.  FTR 10:18.25-.34.

The Richmond County Sheriff's Office property control sheet, describing the items taken from Defendant when he was booked into jail, lists a gray jacket and black tennis shoes.  Gov't Ex. 3.  The Richmond County Supplies Issued form from Defendant's arrest, signed by Defendant twice, lists a blue shirt, black pants, a white undershirt, and white socks. Gov't Ex. 4.  Defendant is also wearing a blue shirt in his booking photo.  (Doc. no. 42-1, Ex. A.)  During his hearing testimony, however, Defendant twice denied wearing a blue shirt the day of his arrest.  FTR 10:34.50-.56; 10:35.20-.24.

### B.    Testimony of Deputy Charlie Walker

The officer Defendant encountered on April 5, 2016, is Deputy Charlie Walker, a six-year veteran with the Richmond County Sheriff's Office.  FTR  10:42.08-.38.  At the time of the encounter, Dep. Walker had been a road deputy for four and one half years, and was

assigned to Zone 5, which covered the area in which Defendant was stopped.  FTR 10:42.38-:43.46.  That day, Dep. Walker was assisting with a suspicious person call that had been assigned to then-deputy Crosby, a twenty-year veteran close to retirement.  FTR 10:44.08-:45.25.  The dispatch call went out at approximately 7:30 to 8:00 a.m. in an area recently plagued with numerous break-ins to homes and automobiles, estimated at four to five daily reports per deputy assigned to the area of Fairmont Street and Dickey Road where the suspicious person call originated.  FTR 10:45.37-:46.02; 10:47.20-.41.

Dep. Walker arrived in the area approximately two to three minutes after the dispatch call.  FTR 10:46.13-:47.08.  Dep. Walker recounted the description of the suspicious person for whom he was looking as a black male wearing a dark hoodie, perhaps dark gray, and blue jeans or dark pants, a description similar, though not an exact match, to that contained in his written report filed after the encounter.  FTR 10:48.25-.50; 11:00.59-:01.15; see also doc. no. 36-1, p. 3.    The dispatch tape, admitted as Government's Exhibit 2, described the suspect as a black male located in the vicinity of Dickey Road and wearing a gray hat, black hoodie, and black pants.  FTR 10:40.45-.49.  Dep. Walker testified when a call goes out to look for a suspect, officers are trained to look for similarities, not exact matches, because officers do not want, for example, to miss a suspect based on a person's description of a certain shade of color that might be slightly different than another's description of the same color.  FTR 11:16.20-:18.12.  For example, even though the dispatch call may have described black jeans and a black hoodie, from a distance the color of the dark clothes may not match exactly but still warrant investigation.  FTR 11:01.45-.54.

6

When Dep. Walker first turned onto Wheeless Road, he encountered an older gentlemen who did not fit the dispatch description at all because he was dressed in all red, and so Dep. Walker kept driving toward Virginia Road.  FTR 10:48.05-.22; 10:49.05-.15; 11:18.15-.30.  Within minutes of the dispatch call, Dep. Walker made visual contact with Defendant, a black male in a dark hoodie or jacket and wearing dark pants - walking in the area of the neighborhood street where the suspect had been reported.  FTR 10:18.37-:19.23. Dep. Walker made his initial approach to Defendant because of those similarities.  FTR 11:19.27-.41.  Dep. Walker pulled his car up with his engine facing Defendant, got out, and asked to talk to Defendant.  FTR 10:49.36-:50.02; 11:02.20-.26; 11:04.44-.56; 11:19.27-.40. When Dep. Walker got out of the car, he left his body camera on the charger in his car rather than following standard procedure of wearing it while on duty.  FTR 10:57.35-.39.

Dep. Walker knew when he first spoke that Defendant was not required to stop to talk to him.  FTR 11:02.38-.52.  Although Defendant could have kept walking, he chose to turn around.  FTR 11:03.10-.15.  Dep. Walker described Defendant's first response in turning around as defensive or aggressive, immediately offering he had not done anything wrong. FTR 10:50.03-.11; 10:52.12-.14.  Dep. Walker responded he wanted to see what Defendant had going on, as he thought Defendant fit the dispatch description of a black male in dark pants and a dark hoodie.  FTR 10:50.13-.41.  When pressed, Dep. Walker could not recall his exact words to Defendant and candidly admitted he could not rule out that he may have used profanity.  FTR 10:51.50-54; 11:05.37.

While Dep. Walker initially planned to merely speak with Defendant and check for any outstanding warrants, Defendant immediately became aggressive and put his hand on the

7

top of his right pocket when Dep. Walker approached.   FTR 10:50.50-:51.08.   As a law enforcement officer, Dep. Walker recognizes a person's hands are very dangerous to him, and placing a hand on a pocket indicated Defendant was trying to hide something.   FTR 10:51.09-.15; 10:52.18-.37.   Dep. Walker further explained safety considerations require that he be able to see the hands of the person to whom he's talking during any type of encounter. FTR 11:06.24-:07.11.   In fact, it is routine procedure, similar to asking for identification, during any encounter to ask an individual to remove their hands from pockets.   FTR 11:15.28-.38.

Therefore, when Defendant's hand went to his right pocket, Dep. Walker immediately grabbed Defendant, placed him on the car, and frisked him.   FTR 10:51.10-.25; 10:52.50-.56. That is when he felt the gun in Defendant's right pocket and went into Defendant's pocket to retrieve the weapon.   FTR 10:51.25-.28; 10:52.57-53.03.   Defendant told Dep. Walker the weapon belonged to his mother.   FTR 10:54.00-.10.   After retrieving the gun, Dep. Walker placed Defendant in handcuffs and put him in the back of his vehicle.   FTR 11:09.50-.58. The 911 caller was brought to the scene to identify Defendant, but the caller was unable to say Defendant, no longer wearing a hoodie, was the person he had seen prowling the neighborhood.   FTR 11:10.10-.22.

From the time Dep. Walker got out of his car until discovery of the firearm, perhaps thirty to forty-five seconds elapsed.   FTR 10:53.05-.24.   No other officers arrived on the scene until after Dep. Walker secured Defendant in the back of his patrol car.   FTR 10:56.10- .25.   Prior to the point Defendant put his hand on his pocket, Dep. Walker never drew his

weapon or blocked Defendant's path, as he was investigating a suspicious person call, not an armed subject call.  FTR 10:54.45-:55.28.

### C.    Testimony of Retired Deputy William Crosby

Deputy Crosby retired from the Richmond County Sheriff's Office on May 1, 2017, after serving over nineteen years as a patrol deputy.  FTR 11:22.09-.23.  Since 1999, Dep. Crosby patrolled Sector 1 of Zone 5, an area covering the location where Dep. Walker encountered Defendant.  FTR 11:22.25-:23.05.  Upon getting the dispatch call, Dep. Crosby first responded to the area of Virginia Road and seeing no one, proceeded to Dickey Road, where he discovered the 911 caller who made the complaint of a suspicious person.  FTR 11:24.00-.40.  The caller reported he had seen a black male wearing dark clothing, perhaps a gray or dark gray hoodie, jumping fences on his way toward Fairmont Street.  FTR 11:25.30-.56.  The area where Dep. Crosby found the 911 caller was well known to him as a problem area for suspicious persons based on the numerous police reports he had previously written for residential and automobile burglaries.  FTR 11:30.26-:31.02.

Less than five minutes after speaking with the 911 caller and broadcasting the information he had obtained, Dep. Crosby was on the scene with Dep. Walker and Defendant.  FTR 11:26.19-.34.  Dep. Walker already had Defendant in the back of the patrol car.  FTR 11:26.35-:27.02.  When Dep. Crosby asked Defendant where he had been and where he was going, he discovered Defendant had been heading in the opposite direction of his stated destination.  FTR 11:27.14-.50.

After speaking with Defendant, Dep. Crosby went back to find the 911 caller to see if he could identify Defendant as the person he had reported.  FTR 11:28.05-.31.  When

Defendant was removed from the back of the patrol car, the caller, standing approximately fifty feet away, could only say the dark clothing looked consistent with what he had seen, but he could not identify Defendant's face.  FTR 11:28.32-:29.03; 11:33.00-.43.  As a result, Defendant was arrested for carrying a firearm without a permit, but not for anything to do with the suspicious person call.  FTR 11:29.05-.38; 11:32.44-:33.10.

### D.     Testimony of Hayward Jackson, 911 Caller

Mr. Jackson has lived on Dickey Road for twenty-six years.  FTR 11:35.00-.19.  On April 5, 2016, he made a call to 911 regarding a suspicious person he observed at approximately 7:00 a.m. from his kitchen bay window looking in the yards of homes as he walked down the street.  FTR 11:35.28-:36.14; Gov't Ex. 1.  Mr. Jackson recalled the person he saw was an African-American male in dark pants and a hoodie, although he acknowledged it had been over one year since the event occurred, acknowledged he "can't remember now" the exact details of what he saw, and suggested "going back to the tape" for the freshest information.  FTR 11:36.20-.55; 11:45.26-.31.  Mr. Jackson was watching the individual carefully because:  (1) there had been several neighborhood break-ins, including a theft of some of his own lawn equipment; (2) he saw the person enter a friend's yard; and (3) he did not recognize the person from the neighborhood.  FTR 11:37.27-:38.15; 11:39.17-.19.  Mr. Jackson moved around inside his house to follow the suspicious person as he continued to look inside the windows of vehicles and houses along his route.  FTR 11:38.19-.48.

Mr. Jackson stayed inside his house to observe until the person went into another back yard Mr. Jackson could no longer see.  FTR 11:38.48-.10.  When the person came back into the street and entered another yard two doors up, Mr. Jackson walked out to his

driveway, and the person took off running when he saw Mr. Jackson.  FTR 11:39.46-:40.38.
The person headed toward Fairmont Street and Dickey Road before jumping a fence and
exiting Mr. Jackson's line of sight.  FTR 11:40.47-:41.18.

Mr. Jackson, who had given his name and phone number when making his report, had
observed the suspicious person for approximately five minutes while on the phone with the
911 operator.  FTR 11:44.32-.39; 11:50.50-:51.05.  When Mr. Jackson made his way back to
his house, a police officer showed up within approximately five minutes, and he told the
officer which way the person was headed.  FTR 11:41.30-:41.47.  Approximately ten to
fifteen minutes later, the officer returned to Mr. Jackson's house and asked if he would be
willing to make an identification of the person.  FTR 11:41.48-:42.41.  Mr. Jackson was
unable to make a "100%" identification and could only tell officers the person looked
"similar" to the person he had seen.  FTR 11:43.10-.29.

Mr. Jackson allowed that what he said on the 911 tape would have been accurate
because it was fresh in his mind, but he could not currently remember the details.  FTR
11:45.19-.31.  However, Mr. Jackson confirmed he was reporting in real time to the 911
operator what he saw that morning as he stood in the street watching the suspicious person.
FTR 11:49.35-.48.  When Mr. Jackson listened to the 911 call, he heard himself first describe
the person as "a black guy with a gray hat on, a black hoodie, and black pants."  FTR
11:44.00-:45.40 (approximately fifty-three seconds into the 911 call at Gov't's Ex. 1).  The
next time he described the person, he stated the person was wearing black pants, a black
hoodie, and a gray shirt.   FTR 11:49.12-.16 (approximately three minutes and forty seconds
into Gov't's Ex. 1).

Mr. Jackson was not comfortable making a positive identification of Defendant when officers removed him from the back of the police car for identification because Mr. Jackson (1) did not believe the person was wearing the same clothes as Defendant; and (2) never saw the person's face when he was observing him while on the phone with the 911 operator. FTR 11:50.07-.34; 11:51.17-.26.   Although Mr. Jackson was confident the person he observed was wearing a hat and dressed in black, he also testified the person could have been wearing anything dark in color.  FTR 11:51.27-:52.30.  Moreover, Mr. Jackson candidly stated that, because Defendant was not wearing a hat when taken out of the back of the police car, Defendant "started looking like a different person" because Mr. Jackson could see his hair for the first time.  FTR 11:52.40-:53.10.

## II.    DISCUSSION

Defendant argues Dep. Walker stopped him without articulable suspicion or probable cause, and therefore the Bryco .380 pistol discovered when the officer frisked Defendant should be suppressed.   (See doc. nos. 35, 41.)   In his hearing testimony, Defendant alternatively contends he felt free to walk away from the initial encounter with Dep. Walker, which then ripened into an improper investigative stop.  The government argues the initial encounter with Defendant was consensual and required no justification under the Fourth Amendment, but even if the encounter were at any point an investigative stop, reasonable suspicion justified the actions of Dep. Walker.  (See doc. nos. 36, 42.)

### A.    Witness Credibility

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing

court to assess the credibility of witnesses." United States v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013) (citation omitted).  In making its credibility determination, the Court must take into consideration not only the interests of the witness and the internal consistency of his testimony, but also his candor and demeanor on the stand.  United States v. Ramirez-Chilel, 289 F.3d 744, 749-50 (11th Cir. 2002).  A reviewing court must accept the fact finder's determination "'unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable fact finder could accept it.'"  Id. at 749 (citation omitted).

After careful scrutiny of the inconsistencies in Defendant's affidavit, testimony, and arguments, including considering his motives and demeanor on the stand, the Court concludes he is not a credible witness.  First, his version of critical events changed during the course of the proceedings.  For example, Defendant's position alternated between asserting that he felt free to leave when Dep. Walker first pulled up and then insisting he was coerced into speaking with Dep. Walker from the first instance the deputy approached him.[1]  Also in paragraph 7 of his affidavit, Defendant stated he never had his hand inside his pocket because he knew that was a threatening gesture to law enforcement officers, but under oath, he tried to retreat from his prior statement and insisted instead it was just his "normal gesture" not to have his hands in his pocket.  Moreover, Defendant averred in paragraph 9 of his affidavit that Dep. Walker "immediately placed his hands inside my pockets" upon

---

[1]Defendant's testimony concerning Dep. Walker's initial comments also differed.  At the hearing, Defendant testified the first thing Dep. Walker said was, "Bring you ass here."  FTR 10:14.28-.34.  Yet in his affidavit, Defendant asserted Dep. Walker first said, "Come here," before moving on to "[b]ring your ass here."  (Def.'s Aff. ¶¶ 4-5.)

walking up to him, but at the hearing he described a frisk where the deputy patted the outside of his clothing, which resulted in discovering the weapon.

Second, Defendant averred he was wearing a white shirt on the day of his arrest and twice denied wearing a blue shirt, but yet at the time of his arrest he twice signed a Supplies Issued form listing a blue shirt. Moreover, the government's supplemental briefing includes Defendant's booking photo showing him in a blue shirt and a decidedly shorter version of the more voluminous dreadlocks the defense highlighted at the hearing as "distinctive" and therefore somehow indicative he was not similar in appearance to the suspect described by Mr. Jackson. Third, the Court must acknowledge Defendant has a significant motive for providing favorable testimony in that the charges brought against him hinge on the discovery of the weapon, which he admitted in the hearing was his and purchased on the street, though he reportedly first asserted on the scene that the weapon belonged to his mother.

Applying the standard guidelines for judging credibility, the Court finds Dep. Walker a credible witness. Dep. Walker testified in a thoughtful, candid, and consistent manner. When pressed as to whether he told Defendant to "bring his ass here," Dep. Walker candidly and repeatedly acknowledged that although he could not remember his exact words, it was possible he had done so. Neither Dep. Walker's demeanor on the stand nor his version of events changed, even when aggressively challenged by defense counsel and confronted with details of past disciplinary action. He acknowledged he had not followed procedure by leaving his body camera in the car, and indeed, a video would likely have dispelled any questions about what exactly happened. But even so, the body camera has nothing to do with the Court's analysis as to the justification for stopping Defendant, and Dep. Walker testified

14

thoroughly and consistently on that score.  Crediting the testimony of Dep. Walker as to what he knew when he stopped Defendant on April 5, 2016, the Court concludes, as explained below, no Fourth Amendment violation occurred.

**B.     There Are Three Tiers of Law Enforcement Encounters with Civilians.**

 Police-citizen encounters generally fall within one of three tiers, each with its own level of Fourth Amendment scrutiny:  "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests."  United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011) (citing United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006)).  As the parties do not argue about the probable cause for an arrest after Dep. Walker found the weapon, the Court focuses its attention on the first two tiers.

The first tier, a consensual encounter, does not implicate the Fourth Amendment, and the government has the burden of proving voluntary consent based on a totality of the circumstances.  Id. at 1186.  However, if a "citizen's cooperation is induced by 'coercive means' or if a reasonable person would not 'feel free to terminate the encounter,'" then a seizure has occurred and the Fourth Amendment applies.  Id. at 1186.  With respect to a tier one, consensual encounter, the law is clear:

> [O]fficers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage-provided they do not induce cooperation by coercive means.

United States v. Drayton, 536 U.S. 194, 200-01 (2002).  In determining whether an encounter is consensual, courts consider, among other factors, whether a person's path is blocked or impeded; whether identification is retained; the number of officers present; any display of weapons; physical touching of the person; and language and tone of voice of the officer. Perez, 443 F.3d at 778.

In a second tier encounter, a police officer may, "in appropriate circumstances and in an appropriate manner, approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  Terry v. Ohio, 392 U.S. 1, 22 (1968).  Law enforcement officers may conduct this type of brief seizure and investigatory detention where "(1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop was reasonably related in scope to the circumstances which justified the interference in the first place."  Jordan, 635 F.3d at 1186 (citation omitted).  "[R]easonable suspicion is a less demanding standard than probable cause," requiring a showing "considerably less than preponderance of the evidence," but there must be "at least a minimal level of objective justification for making the stop."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000); see also United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (same).

A hunch will not suffice.  Terry, 392 U.S. at 27.  Rather, an "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the investigative stop.  Id. at 21.  The officer may then "briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions."  Minnesota v. Dickerson, 508 U.S. 366, 373 (1993).

In conducting its analysis, the Court must evaluate the "totality of the circumstances" to determine whether the investigators had a "particularized and objective basis" for suspecting legal wrongdoing.  United States v. Arvizu, 534 U.S. 266, 273 (2002); see also United States v. Williams, 619 F.3d 1269, 1271 (11th Cir. 2010) (same).  Stated otherwise, reasonable suspicion "takes into account 'the totality of the circumstances – the whole picture.'"  Navarette v. California, 572 U.S. -, 134 S. Ct. 1683, 1687 (2014).  Assessing the whole picture "does not deal with hard certainties, but with probabilities."  United States v. Cortez, 449 U.S. 411, 418 (1981); see also United States v. Lewis, 674 F.3d 1298, 1304 (11th Cir. 2012).  Reasonable suspicion "need not rule out the possibility of innocent conduct," but rather depends on a commonsense approach based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  Navarette, 134 S. Ct. at 1690, 1691.  "Terry accepts the risk that officers may stop innocent people."  Wardlow, 528 U.S. at 126.

"[S]ufficient probability, not certainty, is the touchstone" of Fourth Amendment reasonableness.  Hill v. California, 401 U.S. 797, 804 (1971).  "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community protection.'"  Heien v. North Carolina, 574 U.S. -,135 S. Ct. 530, 536 (2014) (citing Brinegar v. United States, 338 U.S. 160, 176 (1949)).  Indeed, allowing an officer to briefly stop a person and ask questions based on reasonable suspicion "promotes the strong government interest in solving crimes and bringing offenders to justice."  United States v. Hensley, 469 U.S. 221, 229 (1985).  As the Supreme Court recognized,

> The Fourth Amendment does not require a policeman who lacks the precise level of information for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, <u>Terry</u> recognizes that it may be the essence of good police work to adopt an intermediate response.  A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

<u>Adams v. Williams</u>, 407 U.S. 143, 145-46 (1972).

"Once an officer has stopped an individual, he may conduct a pat-down or frisk for weapons if he reasonably believes that his safety or the safety of others, is threatened." <u>United States v. Griffin</u>, 696 F.3d 1354, 1359 (11th Cir. 2012).  There need not be definitive evidence of a weapon or absolute certainty the officer is dealing with an armed individual. <u>Id.</u>  The question "is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  <u>Id.</u>  The Eleventh Circuit instructs that the judgment of trained officers on the scene is to be given great deference on the decision of whether a frisk to ensure safety is necessary.  <u>Id.</u> at 1360; <u>cf.</u> <u>Terry</u>, 392 U.S. at 23 ("American criminals have a long tradition of armed violence, and every year in this county many law enforcement officers are killed in the line of duty, and thousands more are wounded.").

### C.   By Defendant's Own Admission, the Initial Encounter with Dep. Walker Was Consensual, But the Deputy Also Had Reasonable Suspicion to Support a <u>Terry</u> Stop.

#### 1.   Dep. Walker First Encounters Defendant

Defendant testified that when Dep. Walker first pulled up next to him and got out of the car to talk to him, Defendant kept walking because he knew he had not done anything

wrong, and he felt free to keep walking away.  FTR 10:14.44-.49; 10:25.44-.55.  That

Defendant felt free to walk away is a hallmark indicator of a consensual encounter, and

consideration of other relevant factors supports this conclusion.  See Perez, 443 F.3d at 778.

Upon his initial approach, Dep. Walker did not activate his emergency lights, block

Defendant's path with the patrol car, or draw his weapon, and he was the only officer on the

scene.   FTR  10:23.05;  10:23.36-:24.01;  10:29.10-.35;  10:49.36-:50.02;  11:02.20-.26;

11:04.44-.56; 11:19.27-.40.  Thus, by Defendant's own account, his initial encounter with

Dep. Walker when he first pulled up and got out of his car to speak with Defendant was

consensual, meaning the Fourth Amendment did not apply.  See Drayton, 536 U.S. at 200-

01.

Despite this critical concession by Defendant, he still argues the entire encounter was

a coerced, tier two seizure for which reasonable suspicion did not exist.   However, as

explained below, under the totality of the circumstances, there was reasonable suspicion to

conduct a tier two, Terry stop.

### 2. Under the Totality of the Circumstances Known to Dep. Walker, Reasonable Suspicion Existed to Stop Defendant.

In making its determination, the Court is mindful that "[a]n action is reasonable under

the Fourth Amendment, regardless of the individual officer's state of mind, as long as the

circumstances, viewed *objectively,* justify [the] action.  The officer's subjective motivation is

irrelevant."   Brigham City v. Stuart, 547 U.S. 398, 404 (2006) (internal quotations and

citations omitted); see also United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006)

(recognizing "the question . . . is not whether a specific arresting officer . . . actually and

subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search").  Thus, the Court turns its attention to the objective information known by Dep. Walker when he encountered Defendant on April 5, 2016.

Mr. Jackson called the 911 operator to report a suspicious person looking in windows of cars and homes on Dickey Street.  He described to the operator, in real time, two slightly different descriptions of the African-American male he was observing.  Although the person was described as wearing either a gray hat or a gray shirt, he was consistently described as wearing dark clothing, black pants and a black hoodie.  When speaking with Dep. Crosby shortly after ending his 911 call, Mr. Jackson described a black male wearing dark clothing, perhaps a gray or dark gray hoodie.[2]  FTR 11:25.30-.56.

As he testified at the evidentiary hearing, Mr. Jackson could remember only that he saw an African-American male in dark pants and a hoodie, and candidly relied on whatever he stated at the time to the 911 operator as the most reliable information.  When pressed, he acknowledged the person he saw could have been wearing anything dark in color.  FTR 11:51.27-:52.30.  The slight variations in descriptions of a dark color and memory are to be expected from a concerned citizen making a report of suspicious activity in real time and then questioned about it over one year later.  Nevertheless, at the time, Dep. Walker knew he

---

[2]Although now-retired Dep. Crosby had no relevant testimony as to Dep. Walker's actions in stopping Defendant, he did clearly and consistently describe his actions that day, and as he no longer works in law enforcement, Dep. Crosby has no motive to describe anything other than what he recalls what Mr. Jackson told him.  Dep. Crosby's credible testimony on this point is consistent with other, similar descriptions provided by Mr. Jackson.

had been given the most reliable type of tip information from an "'unquestionably honest citizen'" who "'comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability.'" United States v. Williams, 177 F. App'x 914, 919 (11th Cir. 2006) (quoting Illinois v. Gates, 462 U.S. 213, 233 (1983)).

Thus, as the call went out on April 5th, Dep. Walker knew he was looking for an African-American male pedestrian in dark clothing in the vicinity of Dickey Street. Within minutes after the call went out concerning the suspicious person, Dep. Walker encountered Defendant, an African-American male pedestrian in dark clothing within blocks of where the 911 report originated. Moreover, the area was well-known to Dep. Walker and other officers patrolling that area as a high crime area with multiple, recent reports of break-ins.

Defendant's arguments as to why these factors do not amount to reasonable suspicion rely heavily on innocent explanations for all of the factors known to Dep. Walker, if considered independently from each other, when he first encountered Defendant. "Terry, however, precludes this sort of divide-and-conquer analysis." Arvizu, 534 U.S. at 274. Defendant's arguments further demand an exactitude that is not part of the reasonable suspicion analysis. That is, to be reasonable is not to be perfect, and looking at the whole picture requires dealing with probabilities, not hard certainties. Heien, 135 S. Ct at 536; Cortez, 449 U.S. at 418.

Ignoring the totality of the evidence, Defendant argues primarily that he was stopped simply because he was an African-American male walking in a high crime area. When given the chance to provide supplemental briefing to support his contention in light of the evidence produced at the hearing, Defendant produced inapposite cases. (See doc. no. 41.) In Florida

21

v. J.L., 529 U.S. 266 (2000), the Court held reasonable suspicion was not provided by an anonymous tip that a young black male standing at a particular bus stop, not otherwise engaged in criminal behavior, would have a weapon.  In contrast, here, a known citizen tipster described not only an African-American male pedestrian wearing dark clothing, but also provided real time information this person was trespassing and looking in windows in an area specifically known for current problems with break-ins.

Two district court cases cited by Defendant are likewise unavailing.  In one case, the person was stopped simply because he was in a high crime area wearing allegedly gang-related clothes, and refused to stop walking away from the officer.  United States v. Marcelino, 736 F. Supp.2d 1343, 1349-51 (N.D. Ga. 2010).  In a second case, the officer did not have "knowledge from any source regarding . . . the robbery suspects' height, weight, skin color, clothes, or any other identifying features" prior to making a stop, and the officer conceded he stopped the defendant because he was a "young black male" walking in the vicinity of the crime.  United States v. Davis, 354 F. Supp.2d 1271, 1275 (M.D. Ala. 2005).

More analogous are the cases cited in the government's supplemental briefing, (see doc. no. 42), where reasonable suspicion existed to conduct investigative stops when officers arrived within minutes of 911 calls to discover an individual in the general vicinity fitting the 911 description.  See United States v. Felix, No. 2:15-cr-102, 2015 WL 9029012, at *3 (M.D. Fla. Dec. 16, 2015), appeal filed, No. 16-16457 (11th Cir. Oct. 11, 2016); United States v. Davis, 175 F. App'x 286, 288-89 (11th Cir. 2006).  Importantly, some discrepancy between a description provided by dispatch and the officer's observation does not eliminate reasonable suspicion.  See, e.g., United States v. Porter, CR 416-265, 2016 WL 8674273, at

*3 n.4 (S.D. Ga. Dec. 23, 2016) ("[I]t is not uncommon for witnesses who have just been in a stressful situation to furnish information that does not turn out to be completely accurate. Even where there are 'minor inconsistencies involving mutable characteristics,' police may still have reasonable suspicion to stop an individual matching a suspect's description in other respects."), *adopted by*, doc. no. 48 (S.D. Ga. Feb. 6, 2017).

As succinctly summarized by the government, even prior to getting out of his car, Dep. Walker knew the following when he encountered Defendant walking on Wheeless Road:

> 1) the 911 caller details a situation related to potential criminal conduct; 2) the individual matches the physical description provided by a 911 caller; 3) the individual generally matches the description of clothing provided by the 911 caller; 4) the individual is close to the geographical proximity to the reported incident; 5) law enforcement officers encounter the individual within minutes of receiving the emergency dispatch call; [and] 6) the encounter occurs within a high-crime area.

(Doc. no. 42, pp. 1-2.)   Considering the totality of the circumstances, the sum of the information known to Dep. Walker when he first saw Defendant provided reasonable, articulable suspicion to conduct a Terry stop.

Dep. Walker was not required to look for innocent explanations for Defendant's presence on the road.  Nor was he required to pass by Defendant merely because Defendant's exact shade of clothing, though dark, may not have precisely matched the description from the 911 caller.  This is particularly true because Dep. Walker was trained to look for similarities, not exact matches, in conducting investigations.  See United States v. Hernandez-Hernandez, No. 16-14263, 2017 WL 1501072, at *3 (11th Cir. Apr. 27, 2017) ("While each observation considered in isolation may not have been strongly probative of

criminal activity, when considered cumulatively and in the light of the officers' experience and training, the officers' observations constituted sufficient articulable reasonable suspicion that Defendant was engaged in criminal activity."). That Mr. Jackson was not able to provide a positive identification of Defendant is not dispositive, as "Terry accepts the risk that officers may stop innocent people," Wardlow, 528 U.S. at 126, and reasonable suspicion "does not deal with hard certainties, but with probabilities." Cortez, 449 U.S. at 418.

Moreover, once Dep. Walker got out of his vehicle and approached Defendant, he was met with an aggressive and defensive response, along with Defendant's placement of his hand on the top of his pocket, a gesture recognized as a threat to a law enforcement officer. At that point, Dep. Walker was authorized to frisk Defendant based on his legitimate safety concerns. See Griffin, 696 F.3d at 1359 (recognizing once an officer stops an individual, he may frisk for weapons if there is reasonable belief his safety is threatened).

## III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **DENIED**. (Doc. nos. 25, 30, 35.)

SO REPORTED and RECOMMENDED this 28th day of June, 2017, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA